# United States Court of Appeals
## For the First Circuit

RECEIVED
AUG - 3 2006
U.S. DISTRICT COURT
DISTRICT OF R.I.

No. 05-1498

UNITED STATES,

Appellee,

v.

ALBERTO RODRIGUEZ,

Defendant, Appellant.

APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF RHODE ISLAND

[Hon. William E. Smith, U.S. District Judge]

Before

Lipez, Circuit Judge,
Campbell and Bowman*, Senior Circuit Judges.

Joan M. Griffin, with whom Michael K. Sugrue, and Perkins Smith & Cohen LLP were on brief for appellant.

Donald C. Lockhart, Assistant United States Attorney, with whom Robert Clark Corrente, United States Attorney, and Richard W. Rose, Assistant United States Attorney, were on brief for appellee.

August 2, 2006

*Of the Eighth Circuit, sitting by designation.

**CAMPBELL**, **Senior Circuit Judge**. Alberto Rodriguez appeals from his conviction in the United States District Court for the District of Rhode Island for being a felon in possession of a firearm, in violation of 18 U.S.C. §§ 922(g)(1) and 924(e). Rodriguez raises four issues: (1) whether the district court properly denied his motion to dismiss under the Speedy Trial Act ("STA" or "the Act"); (2) whether Rodriguez suffered from ineffective assistance of counsel when his trial attorney did not cross-examine a government witness; (3) whether the district court properly denied Rodriguez's motions for acquittal or for a new trial on the basis of insufficient evidence; and (4) whether the district court abused its discretion in refusing the jury's request for trial transcripts. We affirm.

**Background and Facts**

On November 28, 2003, in the early morning, police officers in the city of Providence, Rhode Island, were following a red car driven by a female relative of Rodriguez. He was sitting in the passenger's seat, and two women were sitting in the backseat. When the car twice failed to signal when turning, one police cruiser turned on its lights and sirens and tried to pull the car over. The car sped ahead, and after a short chase, a second cruiser blocked it by driving in front of it. Before the car came to a full stop, Rodriguez jumped out and began to run. Officer Martin Hames saw that Rodriguez was wearing yellow

sunglasses pushed up on his forehead. Officer Scott Petrocchi chased Rodriguez for about 30 seconds through several backyards, staying within ten feet and never losing sight of him. Early in the chase, Petrocchi noticed that Rodriguez was carrying a black gun, and, using a radio strapped to his shoulder, he radioed his fellow officers, warning that "it looks like" the suspect had a gun in his hand. Petrocchi testified to seeing Rodriguez drop the gun to the ground in the rear yard of 137 or 139 Glenbridge Avenue.

Petrocchi caught Rodriguez soon after he dropped the gun. Rodriguez refused to put his hands in the air or get on the ground even though Petrocchi ordered him to do so at gunpoint. When Petrocchi attempted to handcuff Rodriguez, he struggled to avoid arrest and in the process injured Petrocchi's hand. A second officer arrived on the scene and helped Petrocchi handcuff Rodriguez. Petrocchi told Hames where Rodriguez had dropped the gun, and the gun was subsequently found there lying on the ground. The gun was a Glock .40 caliber semi-automatic pistol loaded with ten rounds. Yellow sunglasses were lying near the gun.

Rodriguez was indicted by a federal grand jury on April 7, 2004 and convicted by a jury on September 29, 2004 after a two-day trial. Prior to trial, on August 25, 2004, Rodriguez filed a motion to dismiss the case because of an alleged Speedy Trial Act violation. The court held a hearing on the motion to dismiss and denied it on the same day, August 31, 2004. At trial, Rodriguez

stipulated that he had a prior felony record and that the gun found in this case had traveled in interstate commerce. Petrocchi testified that while chasing Rodriguez, Petrocchi had "observed him to be carrying a firearm, a black firearm in his right hand." In his radio broadcast at the time of the chase, introduced at trial, Petrocchi stated that it "looks like he's got a gun in his hand." Petrocchi testified further that he saw Rodriguez drop the firearm in the backyard of 137 Glenbridge Avenue and that he then chased him into the yard of 139 Glenbridge. Petrocchi later clarified that "pretty much right as I broadcasted the description, we were in that backyard is when he dropped it." On cross-examination, Petrocchi reiterated that Rodriguez had dropped the gun in the back of 137 Glenbridge before running into the back of 139 Glenbridge. Petrocchi testified that he could not remember whether there was a fence between the two yards. On redirect, he modified his testimony to indicate that he had found the gun in the yard of 139 Glenbridge, not 137, and that 139 was consistent with his police report. On recross, he indicated that he jumped over a fence to get into the backyard of 139 Glenbridge.

Petrocchi testified that he and Hames walked back to the spot where Rodriguez had dropped the firearm and identified that area again as 137 Glenbridge. Petrocchi testified that he had found the gun. Hames testified that he himself had in fact found the gun. Officer Shawn Kennedy's Offense Report and testimony

corroborate Hames' testimony. Kennedy testified that after he saw that Rodriguez had been apprehended, he went back to the area where the pursuit had started and radioed to Petrocchi,"We got a Glock." Petrocchi responded, "I saw it in his hand when I came around the corner."

Detective Paul Renzi testified that he did not test the gun for fingerprints, explaining that it was the policy of the unit at the time of the incident not to fingerprint "firearms that were seized on someone's person." On cross-examination, he testified that the policy not to test weapons for fingerprints had changed after Rodriguez's arrest. Renzi further testified that even though he had the sunglasses found near the gun, he failed to fingerprint them either because he had "visually observed the glasses" for the presence of latent prints and seen none.

The defense called Evelyn Carabello, the driver of the red car and a grandmother of Rodriguez's son. She testified that she did not see Rodriguez holding a gun that night. She further testified that while the police were chasing Rodriguez, Susan "Shorty" Bianchi, another passenger in the car, had gotten out of the red car and walked toward the area where the gun was later found. The defense also called Xiomara Guitard, another passenger. She testified that when the police were trying to pull over the red car, Bianchi showed her a black gun and whispered that it was hers. She said that Bianchi had later followed the police into the

backyard as they chased Rodriguez. Guitard testified that she had lied when she had earlier denied being a passenger in the car and when she had denied seeing a gun.

In rebuttal, the government called Bianchi, who testified that the gun was not hers, that she had never seen it before, that she never showed anyone the gun, and that she had remained on the street during the time that the police were chasing Rodriguez through the backyards. This differed markedly from a witness statement Bianchi had earlier provided to an attorney who is not otherwise named in the record. In the witness statement, made on December 4, 2003, within a week of Rodriguez's arrest, Bianchi said that after seeing the defendant get out of the car and start running, she "got out of the car got rid of the gun, which was a .40 calibur [sic] (Glock) w/10 rounds walked back to the scene and seen what was going on, and what I seen was Alberto getting arrested for my gun." Before her trial testimony began, defense counsel, aware that Bianchi would likely recant the version of events she provided in the witness statement, moved to limit the government's examination of Bianchi so as not to cause himself or his law firm to become a witness in the case if he had to reveal the existence of the prior inconsistent statement. The court denied the motion. On cross-examination, defense counsel did not ask about her prior witness statement but rather asked only one

question, confirming that the Bianchi was over seven months' pregnant at the time of her testimony.

The government introduced a second radio broadcast made right after the chase, in which Petrocchi reported that Rodriguez had had a gun in his hand, in order to rebut the defense suggestion that Petrocchi's direct testimony on the issue had been recently fabricated.

Several months after conviction, the district court sentenced Rodriguez to twenty years in prison, near the bottom of the advisory guidelines range. Rodriguez does not contest his sentence.

## Discussion

### (1) Speedy Trial Act

Rodriguez appeals from the district court's denial of his motion to dismiss on STA grounds, arguing that the government did not bring him to trial within the time prescribed by the STA. This court reviews a district court's denial of a motion to dismiss based upon the STA de novo as to legal rules and for clear error as to factual findings. United States v. Maxwell, 351 F.3d 35, 37 (1st Cir. 2003).

The STA requires a trial to begin within 70 days of the filing of an information or indictment or the defendant's initial appearance. 18 U.S.C. § 3161(c)(1). The Act, however, acknowledges the variety of criminal cases and that in some cases

there may often be good reasons for a longer delay. As recently described by the Supreme Court,

> [t]o provide the necessary flexibility, the Act includes a long and detailed list of periods of delay that are excluded in computing the time within which the trial must start. See § 3161(h). For example, the Act excludes "delay resulting from other proceedings concerning the defendant," § 3161(h)(1), "delay resulting from the absence or unavailability of the defendant or an essential witness," § 3161(h)(3), "delay resulting from the fact that the defendant is mentally incompetent or physically unable to stand trial," § 3161(h)(4), and "[a] reasonable period of delay when the motion for severance has been granted," § 3161(h)(7).
>
> Much of the Act's flexibility is furnished by § 3161(h)(8), which governs ends-of-justice continuances . . . . This provision permits a district court to grant a continuance and to exclude the resulting delay if the court, after considering certain factors, makes on-the-record findings that the ends of justice served by granting the continuance outweigh the public's and defendant's interests in a speedy trial. This provision gives the district court discretion - within limits and subject to specific procedures - to accommodate limited delays for case-specific needs.

Zedner v. United States, 126 S. Ct. 1976, 1983-84 (2006).

Rodriguez argues that the district court erred on two occasions by excluding periods of time before Rodriguez's trial. We disagree. We begin with a description of the chronology of the case, highlighting the disputed time periods and the district court's orders.

**(a) The Chronology**

Rodriguez was arraigned on April 13, 2004. The court then ordered that all pre-trial motions be filed by May 13, 2004. It scheduled trial to begin on May 25. The court also granted

additional time for Rodriguez to examine discovery and prepare pretrial motions and therefore ordered exclusion of the time period from May 4 to May 13. Rodriguez does not dispute this exclusion. On April 29, 2004, the court scheduled the case for jury empanelment on June 4, 2004.

On May 12, 2004, Rodriguez filed two motions: a "Motion to Continue Empanelment" and a "Motion for Enlargement of Time." In the Motion to Continue Empanelment, Rodriguez wrote, inter alia:

> Now comes the accused, Alberto Rodriguez, by and through his counsel, and moves this Honorable Court to continue the empanelment in this matter, currently set for June 4, 2004, to the court's August 2004 empanelment calendar . . . . The time requested pursuant to this Motion is excludable pursuant to 18 U.S.C. § 3161(h)(8), in that the interest of justice in allowing the parties sufficient time to investigate the case and complete discovery prior to the filing of pre-trial motions outweighs the interest of the public and the defendant in a speedy trial. The defendant is faced with a possible life sentence and is entitled to thoroughly investigate all possible defenses.

In the Motion for Enlargement of Time, which sought thirty days for the filing of pretrial motions, Rodriguez wrote,

> The time requested pursuant to this Motion is excludable pursuant to 18 U.S.C. § 3161(h)(8), in that the interest of justice in allowing the parties sufficient time to investigate the case and complete discovery prior to the filing of pre-trial motions outweighs the interest of the public and the defendant in a speedy trial.[1]

---

[1]On June 20, 2006, Rodriguez filed a Fed. R. App. P. 28j Letter addressing the Zedner case and seeking the opportunity to brief further on the case. He also noted that he intends to assert that, though he did not argue it on appeal, the thirty days requested in the motion for enlargement of time was not properly excluded for Speedy Trial Act purposes. Because we find that the

The court granted both May 12 motions in orders dated May 12 but docketed May 13. The motion for enlargement of time was granted in a margin order, but the motion to continue empanelment was allowed in an independent order in which the court, stating its reason, continued the case specifically to the August 2004 trial calendar, as Rodriguez had requested. That order stated, as follows:

> The Defendant's Motion to Continue Empanelment is GRANTED. This matter is continued until the August 2004 trial calendar. Pursuant to Rule 12(f) of the Local Rules of the District of Rhode Island for the United States District Court, the filing and disposition of this Motion constitutes excludable time as defined by 18 U.S.C. § 3161(F).[2] Such a period is excludable, for the reasons stated above, and because the interest of justice in allowing the defendant to fully understand his constitutional rights regarding the criminal charges pending against him outweighs the interest of the public and the defendant in a speedy trial.

Defendant argues the period between June 13, 2004 and July 12, 2004 was inappropriately excluded because the defendant had, in effect, sought only 30 days' extension in both of the pretrial motions allowed on May 13.[3]

---

exclusion of time until the August, 2004 trial calendar was proper, <u>see</u> <u>infra</u>, and the thirty days in question are included in that time period, we do not find it necessary to rule on that newly raised issue.

[2]There is no such provision as 18 U.S.C. § 3161(F). The defendant suggests that the court may have meant to refer to 18 U.S.C. § 3161(h)(1)(F), which addresses the exclusion of time needed to handle motions from filing to disposition.

[3]The defendant does not challenge the exclusion of time from July 12 to July 28 because it is excludable under 18 U.S.C. § 3161(h)(1)(F), which provides for exclusion of time during the pendency of a motion.

On July 2, 2004, the court scheduled the case for jury empanelment on August 4, in keeping with its May 12 order. On July 12, 2004, Rodriguez's court-appointed attorney filed a motion to withdraw dated July 9 but docketed July 12. On July 28, the court granted the motion to withdraw, writing that:

> Defendant's Motion to Withdraw is GRANTED. This matter is continued until the September trial calendar. Pursuant to Rule 12(f) of the Local rules of the District of Rhode Island for the United States District Court, the filing and disposition of this Motion constitutes excludable time as defined by 18 U.S.C. § 3161(F). Such period is deemed excludable, for the reasons stated above, and because the interest of justice in allowing the defendant to fully understand his constitutional rights regarding the criminal charges pending against him outweighs the interest of the public and the defendant in a speedy trial.

On July 29, 2004, the court appointed a new attorney for Rodriguez, and the new counsel entered an appearance on that date. On August 3, the court scheduled the case for jury empanelment on September 1. On August 25, Rodriguez filed a motion to dismiss the indictment based on an alleged STA violation. The government opposed the motion on August 30, and after a hearing on the motion on August 31, the court denied it the same day. At the hearing, Rodriguez conceded that the only excluded time periods at issue were those following the court's May 12 and July 28 orders (namely, the periods from June 13-July 11 and from July 30-August 24) and that he would need to succeed in demonstrating that both time

periods were improperly excluded in order to establish an STA violation.[4]

**(b) Analysis**

We think the period from June 13-July 11 was rightly excluded. The defendant argues that both his motion for enlargement of time and motion to continue empanelment "expressly requested thirty days of excludable time" and thus that the district court erred in granting excludable time beyond the thirty days to the date to which the empanelment had been continued. But while the motion for enlargement of time requested thirty days, the motion to continue empanelment expressly requested that empanelment be continued until August, 2004 and justified that request by citing and discussing the interest of justice exclusion, § 3161(h)(8). The motion stated:

> [t]he time requested pursuant to this Motion is excludable pursuant to 18 U.S.C. § 3161(h)(8), in that the interest of justice in allowing the parties sufficient time to investigate the case and complete discovery prior to the filing of pre-trial motions outweighs the interest of the public and the defendant in a speedy trial. The defendant is faced with a possible

---

[4] The parties disagree about the total number of days at issue here, but their calculations are close enough that the discrepancy does not affect the outcome. If either block of time at issue was properly excluded, the defendant's STA claim fails. According to the defendant's calculations, the total time from arraignment to trial was 142 days, and only 67 days should have been excluded from that total, leaving 75 days of non-excludable time between arraignment at trial. The government calculates that 140 days elapsed between arraignment and trial, but this discrepancy does not affect our analysis.

> life sentence and is entitled to thoroughly investigate all possible defenses.

By separately granting both the motion for a 30-day enlargement of time and the motion to continue empanelment, currently set for June 4, 2004, to the court's August, 2004 empanelment calendar, the court was responding to the defendant's separate requests for excluded time.

It is true the court's order continuing empanelment until the August 2004 trial calendar cites a non-existent provision of the STA, see supra footnote 1, and does not cite § 3161(h)(8), the ends of justice provision. The court stated, however, that "[s]uch a period is excludable, for the reasons stated above, and because the interest of justice in allowing the defendant to fully understand his constitutional rights regarding the criminal charges pending against him outweighs the interest of the public and the defendant in a speedy trial" (emphasis supplied). Thus the court expressly referred to "the interest of justice," a phrase indistinguishable from "ends of justice," in addition to acting in direct response to a motion citing § 3161(h)(8) as its basis. The court later amplified its intentions in its earlier on-the-record ends-of-justice finding at the hearing on the motion to dismiss, stating,

> The intent of that order [granting the motion to continue empanelment], and I think it's a clear meaning on the face of it, is to do two things. One is to provide that the time contemplated by, requested by the defendant in the motion, in this case two motions, to continue

> empanelment and to delay the deadline for filing motions – the order deals only with the motion to continue the empanelment, the longer one. The purpose is to provide that that time is excludable. And secondly to provide that any time between the filing of the motion and my dealing with the motion is also excludable . . . . So the order does those two things, grants the time requested as excludable and provides that the time between the filing and the disposition of the motion is excludable.

The Supreme Court has recently emphasized in Zedner that when a district court grants an ends-of-justice continuance, it must "se[t] forth, in the record of the case, either orally or in writing, its reasons" for finding that the ends of justice are served and they outweigh other interests. 126 S. Ct. at 1989. We believe the district court sufficiently complied, if tersely, with this requirement in its May 12, 2004 order on the motion to continue empanelment by ruling that "the interest of justice in allowing the defendant to fully understand his constitutional rights regarding the criminal charges pending against him outweighs the interest of the public and the defendant in a speedy trial." This ruling followed defendant's own assertion, in his motion seeking precisely such a delay, that the time until August 2004 would be "excludable pursuant to 18 U.S.C. § 3161(h)(8)." Defendant had emphasized that:

> [t]he interest of justice in allowing the parties sufficient time to investigate the case and complete discovery prior to the filing of pre-trial motions outweighs the interest of the public and the defendant in a speedy trial. The defendant is faced with a possible life sentence and is entitled to thoroughly investigate all possible defenses.

The court's reasoning in response that the additional time was necessary to allow the defendant to understand fully his constitutional rights set forth in the record a rational reason for the court's stated conclusion that the interest of justice outweighed the interest of the public and the defendant in a speedy trial. We find no error in the granting of excludable time from June 13 - July 11.[5]

Because the first period of disputed time was properly excluded and is sufficient to bring the trial within the allowable period, we do not and need not to reach the question of whether the second period of disputed time was likewise properly left out of the STA calculus. The district court properly denied Rodriguez's motion to dismiss under the STA.

**(2) Ineffective Assistance of Counsel**

Rodriguez argues that his attorney's failure to cross-examine Susan Bianchi about her earlier written statement claiming the gun as her own constituted ineffective assistance of counsel. Whatever can be said in regard to the possible merits or demerits of this argument, however, we find it to be premature for our consideration in the instant direct appeal.

[5]The court's granting of the motion to continue empanelment until August 2004 excluded the time until that point, but the defendant contests only the period from June 13 - July 11. See supra Note 3.

Ineffective assistance claims should ordinarily be raised in a petition under 28 U.S.C. § 2255. See Massaro v. United States, 538 U.S. 500, 502-08 (2003) (a § 2255 motion is preferable to direct appeal for deciding an ineffective assistance claim); United States v. Martinez-Vargas, 321 F.3d 245, 251 (1st Cir. 2003); United States v. Campbell, 268 F.3d 1, 7 (1st Cir. 2001) (collecting cases). "In all but extraordinary circumstances . . . a claim of ineffective assistance that is raised for the first time in this court will not be entertained." United States v. Martins, 413 F.3d 139, 155 (1st Cir. 2005).

A commonly-expressed reason for not entertaining such claims on direct appeal is that the record is not sufficiently developed to fully evaluate them. Rodriguez argues that this is not the case here, since the

> record reflects that the court below determined, for reasons of sentencing the defendant, that his counsel "made a tactical decision at trial, which is the job of a lawyer, and a difficult situation to make that tactical decision, and he made the decision that he believed was appropriate. And I think the reasons given by [government's counsel] as sort of speculating on the reasons why he made that decision are very, very plausible."

At sentencing, the government, in arguing that Rodriguez had not accepted responsibility for his crime, speculated that the reason defense counsel had not cross-examined Bianchi was that "it would have opened the door for the Government to get into what it believed would have been the testimony." The court noted that it

found "nothing to suggest that [defense counsel] either conspired against [Rodriguez] or inadequately represented him at trial." The defendant argues that because the district court felt able to determine whether there had been ineffective assistance of counsel, this court should likewise wrestle with that issue now. Rodriguez notes that at sidebar before Bianchi's testimony, the defense attorney expressed a desire for limitations on the government's ability to question her, lest the questioning implicate defense counsel as a witness. Rodriguez thus argues that "trial counsel's reasoning behind the claimed ineffective conduct is evident from the record."

We disagree. The record remains undeveloped in several areas, including, inter alia, the full history of Bianchi's prior statements appearing to exculpate defendant, the role of earlier attorneys and investigators in obtaining those statements, whether Rodriguez and/or the other passengers in the car had conspired with Bianchi to commit perjury, when defense counsel learned that Bianchi planned to recant, the discussion that defense counsel had with Rodriguez about how they should handle the situation, efforts by defense counsel to find corroborative witnesses for Bianchi's earlier story, and the strategic and tactical factors considered by defense counsel in deciding to limit cross-examination. See Martins, 413 F.3d at 155 ("Without a fact-specific inquiry into defense counsel's thinking (strategic and tactical) and a knowledge

of what exchanges occurred between counsel and client, any decision we might make on the performance prong of the ineffective assistance test would be inherently speculative").

We hold the present record to be insufficiently developed for us to review Rodriguez's ineffective assistance claim during this direct appeal.

**(3) Motions for Acquittal and for a New Trial**

Rodriguez argues the district court erred when it denied his motion for judgment of acquittal because the evidence was insufficient to sustain a conviction. He likewise argues the district court erred when it denied his motion for a new trial because the evidence preponderated heavily against the verdict. Both claims fail.

**(a) Standards of Review**

In reviewing the denial of a motion for judgment of acquittal, this court "review[s] all the evidence, direct and circumstantial, in the light most favorable to the prosecution, drawing all reasonable inferences consistent with the verdict, and avoiding credibility judgments, to determine whether a rational jury could have found the defendant guilty beyond a reasonable doubt." United States v. Baltas, 236 F.3d 27, 35 (1st Cir. 2001). This standard of review is "formidable," United States v. Loder, 23 F.3d 586, 589 (1st Cir. 1994), and "[d]efendants challenging convictions for insufficiency of evidence face an uphill battle on

appeal." United States v. Hernandez, 218 F.3d 58, 64 (1st Cir. 2000).

The denial of a new trial is reviewed under the manifest abuse of discretion standard. United States v. Villarman-Oviedo, 325 F.3d 1, 15 (1st Cir. 2003).

**(b) Analysis**

Regarding the denial of the motion for acquittal, Rodriguez argues that the evidence presented by the government at trial failed to support his conviction. Since the parties stipulated to the facts that the defendant was a felon and that the gun had traveled in interstate commerce, the only question open at trial was whether Rodriguez had been in possession of the weapon. The defendant argues that the only eyewitness testimony regarding possession came from Petrocchi, whose testimony, Rodriguez submits, was "singularly unimpressive," particularly because his radio broadcast during the chase stated only that it "looked like" Rodriguez had a gun. Rodriguez also points to other flaws in Petrocchi's testimony. Petrocchi testified that he himself had discovered the gun, but other officers testified they had found it. Petrocchi appeared certain about where he had found the gun but was later corrected on redirect. Petrocchi claimed at first to have crossed only one fence while chasing the defendant, though he later corrected himself after evidence showed that he had had to cross two. Rodriguez further criticizes the absence of forensic evidence

such as fingerprints, despite the opportunity to have collected scientific evidence of this sort.

But, even acknowledging these weaknesses, the evidence was ample to meet the government's burden of proof. Whatever uncertainty is introduced by the wording of Petrocchi's radio broadcast made at the moment of chasing the suspect through backyards, Petrocchi's trial testimony that he saw Rodriguez holding a gun was unequivocal. It was the jury's province to determine to what degree that radioed statement undermined the truth of Petrocchi's trial testimony and of the other evidence of defendant's gun possession. Relevant to Petrocchi's testimony and the broader issue of Rodriguez's gun possession was Petrocchi's further testimony that he eventually saw Rodriguez drop the gun on the ground, and the evidence that it was found in, or at least near, the same area where Petrocchi saw Rodriguez drop it. The yellow sunglasses that Hames testified he had seen on Rodriguez's head when Rodriguez initially got out of the car were found near the gun. There was also evidence that Rodriguez fled the car in an apparent attempt to avoid arrest, a circumstance from which the jury might reasonably infer his awareness that if the police were able to take him into custody, they would discover he possessed a gun illegally. "'[N]o premium is placed upon direct as opposed to circumstantial evidence; both types of proof can adequately ground a conviction.'" Hernandez, 218 F.3d at 64 (quoting United States

v. Ortiz, 966 F.2d 707, 711 (1st Cir. 1992)). Compare United States v. O'Shea, 426 F.3d 475, 479-80 (1st Cir. 2005) (denial of motion for acquittal upheld where circumstantial evidence tied suspect to the gun though he was never seen with the gun in his hand). Evidence does not become legally insufficient merely because of some inconsistencies in witnesses' testimony nor questions over, for example, which officer found the gun first and police decisions not to test the gun and sunglasses for fingerprints. These were all proper matters for the jury to evaluate in determining witness credibility and the overall strength of the evidence. We are satisfied that from the evidence presented a rational jury could have found Rodriguez guilty of the offense charged beyond a reasonable doubt.

Likewise, the district court did not abuse its discretion in viewing the same evidence on a motion for a new trial and concluding that a new trial was not warranted.

**(4) The District Court's Refusal to Read Back Testimony**

Finally, Rodriguez argues that the district court erred when it refused the jury's request for the transcript of Petrocchi's testimony. We disagree.

**(a) Standard of Review**

"[R]ereading testimony during jury deliberations rests in the presider's sound discretion." United States v. Akitoye, 923 F.2d 221, 226 (1st Cir. 1991) (citations omitted). "The factors

the judge should consider in responding to a jury's expressed desire to rehear testimony include whether the request is 'reasonably well-focused,' whether there is any physical or logistical impairment to reading' the testimony back, and the amount of time the procedure would probably consume." Id. (citing United States v. Argentine, 814 F.2d 783, 791 (1st Cir. 1987)). "[T]he judge must weigh the reasonableness of the request, the ease or difficulty in compliance, and what is likely to be gained or lost." Id.

**(b) Analysis**

Rodriguez argues that insofar as the jury sought only Petrocchi's testimony, its request was reasonable, well-focused, and practicable to accomplish. The jury's request read: "May we have the transcript of Petrocchi's testimony and all the testimony of the trial" (emphasis supplied). In denying the request, the court found that the request for transcripts should be understood as a request for the physical transcripts, not for a read-back, that the transcripts could not be produced, that rereading the entire trial testimony would be burdensome, and that reading just Petrocchi's testimony "raises the risk in my view of highlighting [his] testimony inappropriately." The court then concluded that the best approach would be to "leave open the possibility of a reread of the testimony of specific witnesses" but to instruct the jury that if it wanted this to happen, its request should be more

specific. The court instructed the jury to this effect, and later in the day the jury responded by requesting two different items. The jury then canceled that request because it had reached a verdict.

Rodriguez now concedes that the jury's request to receive the entire transcript of the whole trial was unreasonable. However, he suggests that the request should be understood as encompassing an independent request for Petrocchi's testimony alone, and on this basis should have been allowed. Rodriguez's counsel raised and preserved the point at the time the judge ruled. Rodriguez argues that because Petrocchi's testimony was only 66 pages of trial transcript, it would not have been "logistically prohibitive" to read it back. Rodriguez emphasizes the unique significance of Petrocchi's testimony, as he was the only witness to see Rodriguez holding the gun.

The jury's request, as worded, was not, however, limited to just Petrocchi's testimony. Moreover, there was some danger, as the court noted, that allowing only Petrocchi's testimony to be read might risk highlighting his testimony inappropriately. We believe the district court did not abuse its discretion in denying the request. As the court noted in its comments to the jury, the trial was brief, and the jurors' collective memory should have been sufficient for their deliberations. The court held open the possibility of reading back the testimony of specific witnesses if

the jury made a further request for that to be done, but the jury did not do so, apparently thinking it unnecessary after further deliberation. The court's handling of the matter did not constitute an abuse of its discretion. See, e.g., United States v. Boulerice, 325 F.3d 75, 84-85 (1st Cir. 2003) (no abuse of discretion where court refused to read back testimony of witness, even though defense characterized the witness as "crucial," where testimony consumed seventy transcript pages and there was "a risk of inappropriately highlighting the testimony of the witness").

For the reasons discussed above, Rodriguez's conviction is **affirmed**.