UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF RHODE ISLAND

- - - - - - - - - - - - - - - -
ALBERTO RODRIGUEZ          :
                          :
      vs.                 :     C.A. No. 07-276 S
                          :
UNITED STATES OF AMERICA   :
- - - - - - - - - - - - - - - -

**MEMORANDUM AND ORDER**

William E. Smith, United States District Judge.

Petitioner Alberto Rodriguez has filed a motion to vacate, set aside, or correct sentence pursuant to 28 U.S.C. § 2255.  For the reasons stated below, that motion is denied.

I.   Background and Travel[1]

On November 28, 2003, in the early morning, Providence police officers observed a red car driven by Evelyn Carabello, a female relative of Rodriguez.  Rodriguez was sitting in the front passenger seat, and two women, Susan Bianchi (Bianchi) and Xiomara Guitard, were sitting in the backseat. [2]  When the car failed to signal while turning, a police cruiser turned on its lights and sirens in an attempt to pull the car over.  The car sped ahead, and after a short chase, a second cruiser blocked it by driving in front of it.  Before the car came to a complete stop, Rodriguez jumped out and began to run.  Officer Scott Petrocchi chased

---

[1] Unless otherwise indicated, the facts relating to the offense are drawn primarily from the appellate decision affirming Rodriguez's conviction, United States v. Rodríguez, 457 F.3d 109 (1st Cir. 2006), and from testimony given at the evidentiary hearing conducted in connection with Rodriguez's § 2255 motion.

[2] It was later disclosed that a third female, Joanna Gonzalez Rodriguez, was also in the back seat.  Her presence is not germaine to the instant proceedings.

Rodriguez through several backyards. Early in the chase, Petrocchi noticed that Rodriguez was carrying a black gun, and he radioed his fellow officers that "it looks like" the suspect had a gun in his hand.

Petrocchi caught up to Rodriguez soon after he dropped the gun, and as Petrocchi attempted to arrest Rodriguez, a struggle ensued. A second officer arrived on the scene and helped Petrocchi handcuff Rodriguez. Petrocchi told Officer Hames where Rodriguez had dropped the gun, and the gun, a Glock .40-caliber semi-automatic pistol, was subsequently found in one of the backyards through which Rodriguez had run. Yellow sunglasses were found lying next to the gun in the yard.

Shortly after his arrest, Rodriguez appeared in state court on charges that, as a result of his arrest, he had violated his state probation from an unrelated offense. Rodriguez was represented by Attorney Matthew Smith in the state court proceedings. Approximately one week after the arrest, Bianchi, one of the passengers in the vehicle from which Rodriguez had fled, contacted Smith's office and stated that she owned and possessed the firearm in question on the night of the arrest. At Attorney Smith's suggestion, Bianchi completed a handwritten statement stating that the gun was hers and that she "got rid of" it while the police were chasing Rodriguez. This statement is further discussed infra.

On April 7, 2004, Rodriguez was indicted by a federal grand jury for possessing a firearm after having been convicted of a felony, in violation of 18 U.S.C. §§ 922(g)(1) and 924(e).

-2-

Rodriguez was initially represented by two different Federal Defenders, Olin Thompson and Edward Roy. Approximately two months before trial, Attorney Robert B. Mann was appointed to represent Rodriguez.

A jury was empaneled and a three-day trial ensued. The principal issue at trial was whether Rodriguez had possessed the gun on the night of his arrest, as the parties had stipulated that he had a prior felony record and that the firearm in issue had traveled in interstate commerce. Officer Petrocchi testified that while chasing Rodriguez, he "observed him to be carrying a firearm, a black firearm in his right hand." United States v. Rodríguez, 457 F.3d 109, 112 (1st Cir. 2006). In the recording of the radio communications made at the time of the chase, a portion of which was played at the trial, Petrocchi stated "it looks like he's got a gun in his hand" or words to that effect. Id. Although Petrocchi testified that he found the gun after apprehending Rodriguez, Officer Hames testified that he (Hames) found the gun. Id. Detective Renzi testified that he took possession of the gun and sunglasses at the location where they were found but that he did not test the gun in question for fingerprints. Id.

The defense presented two witnesses, Evelyn Carabello and Xiomara Guitard, both of whom were in the vehicle with Rodriguez. Carabello, the driver of the vehicle, testified that she did not see Rodriguez with a gun that night and that while the police were chasing Rodriguez, Susan Bianchi, another passenger, exited the red car and walked toward the area where the gun was later found. Id.

Guitard testified that when the police were trying to pull over the car, Bianchi showed her a black gun and whispered that it was hers and that Bianchi had later followed the police into the backyard as they chased Rodriguez. Id. The defense also called Officers David Moscarelli and Shawn Kennedy concerning their roles in the arrest. Because Bianchi had recanted her statement at the beginning of the trial, she was not called as a defense witness. Rodriguez did not testify.

The Government then called Bianchi as a rebuttal witness. At a bench conference held immediately before Bianchi's direct testimony, Attorney Mann, aware that Bianchi would likely recant the version of events she had provided in the witness statement, moved to limit the Government's examination of Bianchi so as not to cause himself or his law firm to become a witness in the case if he had to reveal the existence of her prior inconsistent statement. Id. at 113. This Court denied the motion. Id. Bianchi then testified that the gun was not hers, that she had never seen it before, that she never showed anyone the gun, and that she had remained on the street during the time that the police were chasing Rodriguez. Id. at 112. Although this testimony differed substantially from the written statement Bianchi had earlier provided, the Government prosecutor did not ask Bianchi about (or make any reference to) this statement.

Immediately after Bianchi's direct examination defense counsel requested and was given a brief recess to consult with Rodriguez.

On cross-examination, Attorney Mann asked only one question, confirming that Bianchi was more than seven months pregnant at the time of her testimony. Id. at 113. The Government then re-called Officer Petrocchi and introduced a further portion of the radio communication, in which Petrocchi reported that Rodriguez had a gun in his hand, in order to rebut any contention that Petrocchi recently fabricated his testimony on that point. Id.

Rodriguez was found guilty of the offense charged. The Presentence Report (PSR) calculated a guideline range of 235 - 293 months and further found that Rodriguez was subject to being sentenced as an armed career criminal offender, triggering a minimum mandatary sentence of 15 years. (PSR ¶¶ 20-23, 71-72). At the sentencing hearing on March 25, 2005, Rodriguez was represented by new appointed counsel, William Dimitri, who argued Rodriguez's objections to the PSR. After hearing, this Court sentenced Rodriguez to twenty years imprisonment, followed by five years of supervised release.

Rodriguez appealed to the First Circuit, represented by still different counsel, Attorney Joan M. Griffin. On appeal, Rodriguez argued: (1) that the district court improperly denied his motion to dismiss under the Speedy Trial Act; (2) that his trial counsel rendered ineffective assistance by failing to adequately cross-examine a government witness; (3) that the district court improperly denied Rodriguez's motions for acquittal and for a new

trial on the basis of insufficient evidence; and (4) that the district court abused its discretion in refusing the jury's request for trial transcripts during deliberations. The Court of Appeals found that the ineffective assistance claim was premature, rejected Rodriguez's remaining arguments and affirmed his conviction. See Rodriguez, 457 F.3d 109. Further review was denied by the United States Supreme Court. Rodriguez v. United States, 549 U.S. 1233 (2007).

### § 2255 Motion to Vacate and Evidentiary Hearing

Rodriguez timely filed the instant motion to vacate in July 2007.[3] In his motion and supporting papers Rodriguez asserts four primary claims: (1) that his trial counsel rendered ineffective assistance by failing to cross-examine Bianchi concerning her prior written statement that she possessed the firearm in question; (2) that the prosecution failed to disclose exculpatory evidence to the grand jury and at trial, in violation of Brady v. Maryland, 373 U.S. 83 (1963); (3) that certain police witnesses gave perjurious testimony at trial; and (4) that he was denied his right to be tried by an impartial jury because the entire jury pool was tainted

---

[3] Rodriguez has also filed a separate civil action in this Court stemming from his arrest, alleging: (1) a claim under the Freedom of Information Act (FOIA) seeking certain police documents and dispatch reports relating to his arrest; and (2) a claim that Providence Police used excessive force incident to his arrest, in violation of his civil rights. See Rodriguez v. Providence Police Dep't, C.A. No. 08-003-S. This Court has previously dismissed the FOIA claim; the civil rights claims are addressed in a separate Memorandum and Order issued this date.

when a potential juror asked prejudicial questions concerning his record during jury selection. Although not asserted as formal claims, Rodriguez also complains that his trial counsel failed to call him as a witness at trial and that his appellate counsel rendered ineffective assistance on direct appeal.

After the Government filed its response and Rodriguez filed a reply and supplemental filings, this Court determined that an evidentiary hearing was warranted as to Rodriguez's first ineffective assistance claim and appointed Attorney George West to represent Rodriguez.[4] After several pre-hearing proceedings and

---

[4] In its decision affirming Rodriguez's conviction, the Court of Appeals identified a number of factual issues to be determined before his ineffective assistance claims could be properly ruled on. The Court stated:

> The record remains undeveloped in several areas, including, inter alia, the full history of Bianchi's prior statements appearing to exculpate defendant, the role of earlier attorneys and investigators in obtaining those statements, whether Rodriguez and/or the other passengers in the car had conspired with Bianchi to commit perjury, when defense counsel learned that Bianchi planned to recant, the discussion that defense counsel had with Rodriguez about how they should handle the situation, efforts by defense counsel to find corroborative witnesses for Bianchi's earlier story, and the strategic and tactical factors considered by defense counsel in deciding to limit cross-examination. See [United States v.] Martins, 413 F.3d [139,] 155 [(1st Cir. 2005)] ("Without a fact-specific inquiry into defense counsel's thinking (strategic and tactical) and a knowledge of what exchanges occurred between counsel and client, any decision we might make on the performance prong of the ineffective assistance test would be inherently speculative.").

Rodriguez, 457 F.3d at 118.

several continuances,[5] a two-day evidentiary hearing was conducted by this Court on September 2 and 8, 2010.

Six witnesses testified at the evidentiary hearing.[6] Attorney Mann testified that early on he learned of Bianchi's previous statement taking responsibility for the gun in question on the night of arrest and that he or his investigator had spoken with Bianchi prior to trial and she stuck by her statement. (See Tr. of Evidentiary Hr'g on § 2255 Mot. to Vacate 13-22, Sept. 2, 2010 ["Sept. 2, 2010 Evid. Hr'g Tr."].) He stated that he became concerned when on the eve of trial, he learned that Bianchi was unwilling to testify and that, at his request, she was detained as a material witness after failing to respond to a witness subpoena. (Id. at 35-37.) When Mann met with Bianchi the night before she was scheduled to testify, she informed him that she would disavow her previous statement that the gun was hers and would testify that the statement was made under pressure from Rodriguez's family. (Id. at 38-39.)

---

[5] In preparation for the evidentiary hearing, Rodriguez's appointed counsel filed several motions, including a motion seeking authorization to conduct depositions (ECF No. 33) and a motion to withdraw as counsel (ECF No. 41), which were the subject of separate hearings and rulings. In addition, Rodriguez, both before and after his counsel was appointed, filed a number of  pro se motions and supplemental memoranda in support of his motion to vacate. These filings essentially reiterated the claims set forth in his motion to vacate.

[6] See generally Tr. of Evidentiary Hr'g on § 2255 Mot. to Vacate Sept. 2, 2010 ["Sept. 2, 2010 Evid. Hr'g Tr."] and Tr. of Evidentiary Hr'g on § 2255 Mot. to Vacate Sept. 8, 2010 ["Sept. 8, 2010 Evid. Hr'g Tr."]. Bianchi could not be located by counsel and therefore did not testify at the evidentiary hearing.

On the same evening Mann met with Rodriguez, after which he decided not to call Bianchi as a witness. (Id. at 39.) While Attorney Mann could not recall all of the details of his discussion with Rodriguez on this point, he stated that they likely discussed the pros and cons of calling Bianchi, possibly as a hostile witness, but he decided on balance that it was better not to call her. (Id. at 57-58.) He stated that the decision to call a witness was a judgment call primarily for the lawyer but only after consultation with the client. (Id. at 58-59.)

Attorney Mann further testified that when he learned at trial that the Government would be calling Bianchi as a Government witness, he requested a side-bar at which he expressed his concern that he or his firm could be made a witness should the issue of Bianchi's prior statement arise during her testimony. (Id. at 68-69.) He did not seek a continuance of the trial, nor did he seek to check with Rodriguez's family concerning Bianchi's prior statement, as the Government's direct examination of Bianchi did not reference that statement and Mann had determined not to question her on it. (Id. at 63-65.)

Attorney Mann testified that the decision not to cross-examine Bianchi concerning her prior statement was likewise his, made after consultation with Rodriguez and was based on a similar concern that Bianchi would say that her statement was fabricated at the request of Rodriguez's family to help Rodriguez. (Id. at 65-66, 77-78, 81, 92-93.)

Finally, Attorney Mann testified that Bianchi's recantation did not change the previous decision, made after consultation with Rodriguez, that Rodriguez would not testify at trial, in part due to his prior record, which included a conviction for suborning perjured testimony. (<u>Id.</u> at 97-99.)

Attorney Matthew Smith, Rodriguez's counsel in his state court proceedings immediately after his arrest, testified that Susan Bianchi approached his office approximately one week after Rodriguez's arrest. (<u>See</u> Sept. 8, 2010 Evid. Hr'g Tr. at 23-24.) Because it was unusual for another person to come forward and "take the blame" for a firearm charge, he and his investigator personally met with Bianchi to discuss the events on the night of the arrest. (<u>Id.</u> at 24.) Smith then had her write out and sign the statement taking responsibility (Ex. 1).[7] (<u>Id.</u> at 24-25.)[8]

---

[7] In the witness statement dated December 4, 2003, Bianchi avers that after seeing Rodriguez get out of the car and start running, she "got out [of] the car[,] got rid of the gun, which was a .40 caliber (Glock) w/10 rounds[,] walked back to the scene and seen what was going on, and what I seen was Alberto getting arrested for my gun." (Witness Statement, Ex. 1 at 1.) Bianchi further asserted that "No one in the car knew of the gun that I had that night" and that when she saw the police chasing Rodriguez, "I took advantage of that and hid the gun as soon as I could." (<u>Id.</u>) Finally, she asserted that "I am giving this statement voluntarily and of my own free will because it is the truth." and "I am willing to testify under oath regarding my statement and willing to speak to the Providence Police about my involvement in this case." (<u>Id.</u> at 2.)

[8] Smith testified that the state court violation hearing was either withdrawn or otherwise discontinued. (Sept. 8, 2010 Evid. Hr'g Tr. at 28-29.) The result of that proceeding is immaterial here.

At the request of Rodriguez's counsel and over the Government's objection, this Court permitted Attorney Smith to give a professional opinion concerning the proprietary of Attorney Mann's decision to limit his cross-examination of Bianchi. Smith testified that in his opinion the decision was a judgment call and a tactical decision; that in hindsight Attorney Mann may have made a different decision; and that he himself may have made a "different decision" concerning the cross-examination had it been his case. (Id. at 38-40.) On cross-examination, Smith admitted that he was not familiar with the details of the Rodriguez trial, including the testimony of the witnesses. (Id. at 41-42.)

Timothy Fitzgerald, Jr., Attorney Mann's investigator in the Rodriguez case, testified that he first met with Bianchi on September 16, 2004 and that she stood by her statement on that occasion and at a subsequent meeting with Attorney Mann and Fitzgerald at Attorney Mann's office on September 22, 2004. (Id. at 59-60.) He further testified that on September 27 he attempted to locate Bianchi when she failed to respond to a witness subpoena but was unable to locate her. (Id. at 61-62.)

Xiomara Guitard testified that she did not speak to Bianchi about either Bianchi's written statement or her testimony on behalf of Rodriguez, nor did she speak with Caraballo regarding these matters. (Id. at 71-73.) Caraballo likewise testified that she did not speak to Bianchi about her taking responsibility for the gun that night, nor did she discuss Bianchi's testimony concerning the firearm with either Bianchi or Guitard. (Id. at 80-81.)

-11-

Alberto Rodriguez testified that Attorney Smith informed him of Susan Bianchi's statement that the gun was hers and that she appeared at one of his state violation hearing dates but did not testify. (<u>Id.</u> at 86-88.)  From his initial conversations with Attorney Mann, Rodriguez understood that his defense would be based on the expectation that Bianchi would testify that the gun was hers, that other passengers in the vehicle would testify in his favor and that he would testify as to why he ran from the vehicle. (<u>Id.</u> at 93-94.)

Rodriguez stated that the night before Bianchi's testimony, Attorney Mann advised him that he had spoken with Bianchi and she had recanted and would no longer testify in accordance with her statement. (<u>Id.</u> at 96-97.)  According to Rodriguez, Attorney Mann told him that the Court could call Bianchi and if that occurred, Mann would reveal the existence of her prior statement and would "tear her apart" on cross-examination. (<u>Id.</u>)  Rodriguez stated that he did not agree with any decision not to call Bianchi as a defense witness. (<u>Id.</u> at 97-98.)

When Attorney Mann informed him the next day that Bianchi would be testifying for the Government, Rodriguez believed that her prior statement would come out on cross-examination. (<u>Id.</u> at 99-100.)  Rodriguez stated that during the recess taken immediately after Bianchi's direct testimony for the Government, he met with Attorney Mann's law clerk but not with Attorney Mann, as Mann was attempting to reach Attorney Smith, and that Mann did not discuss

Bianchi's cross-examination with him. (Id. at 101-03.) He stated that upon returning to the courtroom, Mann informed Rodriguez he was unable to reach Attorney Smith and then asked him if he still wanted to testify. (Id. at 103-04.)[9]

Rodriguez also testified that although he and Attorney Mann had discussed Rodriguez's testifying at trial, he was never called to the stand. (Id. at 106-07.) He further stated that he had sought tape recordings of police dispatch communications on the night of his arrest in an effort to show that the timing and duration of the events surrounding his arrest were different than what was testified to a trial. (Id. at 109-111.)[10] On cross-examination, Rodriguez admitted that he had previously been convicted of suborning perjury at a previous court hearing but reiterated that he did not consent to limit the scope of the Bianchi's cross-examination and that he had wanted to testify at trial but his counsel did not call him. (Id. at 117-121.)

At the conclusion of the hearing, this Court gave both parties an opportunity to submit post-hearing memoranda. Rodriguez has done

---

[9] Rodriguez also testified that at that point he asked Attorney Mann to withdraw as his counsel but Mann declined to do so. (Sept. 8, 2010 Hr'g Tr. at 104.) He stated he did not inform this Court concerning either his desire to have his counsel withdraw or his expectation that he would testify, due to the fact that he had previously been warned by the Court to speak only through his counsel. (Id. at 104-05.)

[10] At the hearing a tape recording of dispatch communications relating to the arrest was admitted as Exhibit 15. See infra at 31.

so; the Government has not made any submission. This Court has reviewed the record, including the transcript and submissions of the parties, and this matter is now ready for decision.

II. Discussion

    A.   General Principles

    Title 28 U.S.C. § 2255 provides in pertinent part:

> A prisoner in custody under sentence of a court established by Act of Congress claiming the right to be released upon the ground that the sentence was imposed in violation of the Constitution or laws of the United States, or that the court was without jurisdiction to impose such sentence, or that the sentence is in excess of the maximum authorized by law, or is otherwise subject to collateral attack, may move the court which imposed the sentence to vacate, set aside or correct the sentence.

28 U.S.C. § 2255(a).

    Generally, the grounds justifying relief under § 2255 are limited. A court may grant such relief only if it finds a lack of jurisdiction, constitutional error or a fundamental error of law. See United States v. Addonizio, 442 U.S. 178, 184-185 (1979) ("An error of law does not provide a basis for collateral attack unless the claimed error constituted a fundamental defect which inherently results in a complete miscarriage of justice.") (internal quotation marks and citation omitted).

    Moreover, a motion under § 2255 is not a substitute for a direct appeal. See United States v. Frady, 456 U.S. 152, 165 (1982). A movant is procedurally precluded from obtaining § 2255 review of claims not raised on direct appeal absent a showing of

both "cause" for the default and "actual prejudice" -- or, alternatively, that he is "actually innocent" of the offense for which he was convicted. <u>Bousley v. United States</u>, 523 U.S. 614, 622 (1998) (citations omitted). <u>See</u> <u>also</u> <u>Brache v. United States</u>, 165 F.3d 99, 102 (1st Cir. 1999). Claims of ineffective assistance of counsel, however, are not subject to this procedural hurdle. <u>See</u> <u>Knight v. United States</u>, 37 F.3d 769, 774 (1st Cir. 1994).

Ineffective Assistance

A defendant who claims that he was deprived of his Sixth Amendment right to effective assistance of counsel must demonstrate:

(1)  That his counsel's performance fell below an objective standard of reasonableness; and
(2)  [A] reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different.

<u>Strickland v. Washington</u>, 466 U.S. 668, 687-88, 694 (1984). <u>See</u> <u>United States v. Manon</u>, 608 F.3d 126, 131 (1st Cir. 2010) (same).

In assessing the adequacy of counsel's performance, the Court looks to "prevailing professional norms." All that is required is a level of performance that falls within generally accepted boundaries of competence and provides reasonable assistance under the circumstances. <u>Scarpa v. Dubois</u>, 38 F.3d 1, 8 (1st Cir. 1994) (citing <u>Strickland</u>, 466 U.S. at 688-89). To satisfy the deficient-performance prong, the defendant "'must identify the acts or omissions of counsel that are alleged not to have been the result

-15-

of reasonable professional judgment,' and the court then determines whether, in the particular context, the identified conduct or inaction was 'outside the wide range of professionally competent assistance.'" Manon, 608 F.3d at 131 (quoting Strickland, 466 U.S. at 690).

To satisfy the prejudice requirement under Strickland, a defendant must show a reasonable probability that, but for counsel's errors, the outcome of trial would have been different. "A reasonable probability is one sufficient to undermine confidence in the outcome. In making the prejudice assessment, [a court] focus[es] on the fundamental fairness of the proceeding." Manon, 608 F.3d at 131 (citations and internal quotations omitted). Accord United States v. Theodore, 468 F.3d 52, 56 (1st Cir. 2006).

In addition, an attorney's trial performance is accorded deferential review and a court should not assess the attorney's performance based on hindsight. Strickland, 466 U.S. at 689-90; Lema v. United States, 987 F.2d 48, 51 (1st Cir. 1993). Finally, "[t]he Constitution guarantees only an 'effective defense, not necessarily a perfect defense or a successful defense.'" Peralta v. United States, 597 F.3d 74, 79 (1st Cir. 2010) (quoting Scarpa, 38 F.3d at 8).

B.   Claims

     1.  Ineffective Assistance – Failure to Question Bianchi

Rodriguez's first claim -- and the principal claim at the evidentiary hearing -- was that his trial counsel, Attorney Mann, rendered ineffective assistance by failing to question Susan Bianchi at trial concerning a prior written statement she had given that exculpated Rodriguez. In essence, Rodriguez argues that Attorney Mann was deficient in: (1) failing to call Bianchi as a defense witness, even after learning that she was recanting her prior statement; and (2) failing to extensively cross-examine Bianchi on that statement after she testified as a Government witness.

The legal principles regarding these issues are well settled and may be succinctly stated. "The decision whether to call a particular witness is almost always strategic, requiring a balancing of the benefits and risks of the anticipated testimony." Lema, 987 F.2d at 54. Moreover, the First Circuit has noted that "choices in emphasis during cross-examination are prototypical examples of unchallengeable strategy." Phoenix v. Matesanz 233 F.3d 77, 83 (1st Cir. 2000) (citing Matthews v. Rakiey, 54 F.3d 908, 916-18 (1st Cir. 1995)). See Henderson v. Norris, 118 F.3d 1283, 1287 (8th Cir. 1997) ("Courts generally entrust cross-examination techniques, like other matters of trial strategy, to the professional discretion of counsel."). In addition, there is a "strong presumption" of correctness to which counsel's

tactical decisions concerning strategy are entitled.  <u>Strickland</u>,

466 U.S. at 689; <u>Lema</u>, 987 F.2d at 56.

        After hearing the testimony of all witnesses and reviewing the

record, this Court concludes that Rodriguez has not shown

ineffective assistance on the part of his counsel -- as to either

the decision not to call Bianchi as a defense witness or the

decision not to vigorously cross-examine her regarding her prior

statement – so as to warrant relief.[11]

        Based on the testimony of Attorney Mann, Rodriguez, and Mann's

investigator (Fitzpatrick), it was clear that in preparing for

trial, Mann viewed Bianchi as a crucial defense witness for

Rodriguez, in view of her voluntarily providing a written statement

exculpating Rodriguez.  The evidence shows that prior to trial

Bianchi met with Fitzpatrick at least once, and then a second time

with him and Attorney Mann, to confirm her version of the events on

the night of the arrest.  Then on the eve of trial, Bianchi failed

to respond to a witness subpoena, and she was apprehended by the

U.S. Marshals and detained as a material witness at Mann's request.

        a.    Decision Not to Call Bianchi As a Witness

_____

        [11] This Court further finds no evidence of any agreement among
the other occupants of the car from which Rodriguez ran that
Bianchi would submit a statement exonerating him from
responsibility for the firearm.  As noted <u>supra</u> at 12, both
Caraballo and Guitard denied that they had spoken to, or made any
agreement with, Bianchi concerning either her written statement or
her testimony at trial taking responsibility for the gun.

Both Rodriguez and Attorney Mann agree that Mann met with Bianchi on the night she was detained (and the evening before she testified) and that from this meeting it was obvious there were problems with calling her as a defense witness. According to Mann, Bianchi had made it clear she was unwilling to testify consistently with her prior statement that she had the gun on the night of Rodriguez's arrest. (Sept. 2, 2010 Evid. Hr'g Tr. at 38-39.)

When Mann met with Rodriguez later that evening, they discussed the fact that Bianchi had disavowed her statement and its implications for Rodriguez's defense. This Court credits Mann's testimony that he discussed with Rodriguez the pros and cons of calling Bianchi and that Rodriguez agreed with his advice that it would not be wise to call her as a witness. Attorney Mann's decision not to call Bianchi as a defense witness was not only strategic but also a matter of common sense. Mann was understandably concerned that calling Bianchi posed a substantial risk that she would tell the jury that the statement was false and was fabricated at the request of Rodriguez's family.[12]

---

[12] Mann's testimony on this point is telling:

Q.   Okay.  Can you explain why you did not call Susan Bianchi at
     that point.
A.   Yes.
        *      *      *
Q.   Why did you do that?
A.   Well, the reason I didn't call her [as a defense witness] was
     because when we spoke to her, and I think this would have been
     the night of the 27th, she had told us that she would no
     longer testify that the gun was found -- the gun found on that

By contrast, Rodriguez's testimony – that there was no agreement to refrain from calling Bianchi, and that it was understood that Attorney Mann would call her as a hostile witness in order to impeach her with her prior statement – not only lacks credibility but is at odds with Attorney Mann's concern that the jury would hear her repudiate her statement.

In short, even assuming that Attorney Mann's decision not to call Bianchi ran against Rodriguez's wishes, it constitutes a tactical decision that was not unreasonable and thus not objectively deficient. <u>Strickland</u>, 466 U.S. at 689; <u>Lema</u>, 987 F.2d at 51-52. This is so even if other approaches may have been available (e.g., calling Bianchi as a hostile witness, calling

---

date, 11/28/03 I think it was, was hers. Instead, she would say that she was just trying to help Alberto Rodriguez out.
    I think in that conversation, and it's not in my memo or the office memo, she also said at some point to us words to the effect that she made her prior statement under pressure from Mr. Rodriguez's family.
    So if I called her, she was going to disavow the statement that the gun was hers. She might well have said that she made the statement under pressure from members of Mr. Rodriguez's family. Clearly, I didn't think that would help us, and so I elected not to call her.

(Sept. 2, 2010 Evid. Hrg. Tr. at 38-39.)
        *    *    *
A.  It was a judgment call we made. And my judgment call was, with Mr. Rodriguez's agreement, as I remember it, was that it would have made absolutely no sense for me to call as a witness a woman who was going to stand up there and say, Yes, I made a statement that it was my gun, but it's not my gun, and then go on to say possibly, if she were allowed to, that she was pressured into saying that.
    I think that that would be very, very harmful. I thought at tha<u>t</u> point that it was very harmful to the defense. . . .

(<u>Id.</u> at 50.)

-20-

other witnesses to testify regarding her prior statement, or seeking a continuance). Moreover, there was no prejudice to Rodriguez from the decision not to call Bianchi, as she was called by the Government as a rebuttal witness and thus testified at trial in any event.

b.   Failure to Vigorously Cross-Examine Bianchi

Attorney Mann's decision not to cross-examine Bianchi on her prior written statement (or otherwise extensively cross-examine Bianchi) likewise did not constitute objectively deficient performance.

The evidence shows that on the morning Attorney Mann learned that Bianchi would testify as a Government witness, he relayed his concern, at a bench conference prior to Bianchi's appearance, that if Bianchi were questioned about her previous written statement, he and his office -- given their conversations with Bianchi about that statement -- could likely become potential witnesses, thereby giving rise to the possibility of a mistrial.[13] This Court deferred

_____

[13] Rodriguez does not argue, nor could he, that Attorney Mann's concern that he or his office could become a potential witness in the case somehow implied a conflict of interest on Attorney Mann's part. "To show an actual conflict of interest, the defendant must show that 'the lawyer could have pursued a plausible alternative defense strategy or tactic' and that 'the alternative strategy or tactic was inherently in conflict with or not undertaken due to the attorney's other interests or loyalties.'" United States v. Sotomayor-Vazquez, 249 F.3d 1, 15 (1st Cir. 2001) (quoting United States v. Soldevila-López, 17 F.3d 480, 486 (1st Cir. 1994)).
    Here, it is clear to this Court that Mann's concern that questioning Bianchi as to her prior statement might cause him or his office to become a witness, thereby triggering a mistrial, was secondary to his primary concern that such questioning could have

imposing any restriction on the prosecutor's questions at that point.

On direct examination, Bianchi testified that the gun was not hers and that she did not see the gun that evening. The Government prosecutor kept the inquiry narrow and did not question her concerning her previous statement. This Court then took a brief recess to permit Mann to consult with Rodriguez. When the trial resumed, Attorney Mann asked only a single question of Bianchi on cross-examination, confirming that she was then seven and one-half months pregnant.

This Court finds Attorney Mann's testimony regarding the events surrounding his decision whether to cross-examine Bianchi to be more credible than that of Rodriguez. Mann testified unequivocally that the reason he refrained from any further cross-examination of Bianchi at trial was his concern that if he attempted to impeach her with her previous statement, she would assert that the statement was false and was given at the behest of Rodriguez's family in order to exonerate Rodriguez, and that such an admission would be "devastating" to Rodriguez's case. (Sept. 2, 2010 Evid. Hr'g Tr. at 74-75, 85-86.) Even if he avoided cross-

_____

elicited testimony that her prior statement had been fabricated at the request of Rodriguez's family, which would have been very harmful to Rodriguez's interests. See n.12, supra. Thus, there was no "actual conflict of interest [that] adversely affected [Attorney Mann's] performance" that would give rise to an ineffective assistance claim. Soldevila-López, 17 F.3d at 486.

examining Bianchi on why she agreed to give the statement, those reasons would likely have been elicited on redirect by the Government, and that either way, the effect of this testimony on the jury would likely have been very harmful to Rodriguez's interests. (Id. at 73-74.) In addition, this Court further credits Mann's testimony that the decision not to cross-examine Bianchi on her statement was made after consultation with Rodriguez during the recess after her direct examination. (Id. at 77-78, 81; Sept. 8, 2010 Evid. Hr'g Tr. at 9-11.)

By contrast, Rodriguez's testimony –- that during the recess immediately after Bianchi's direct examination, Attorney Mann sought to reach Attorney Smith and never discussed with him how to cross-examine Bianchi[14] –- is at odds with the purpose for which the recess was granted and with this Court's observation and recollection of the events at trial.[15]

---

[14] On this point, Mann testified that he could not recall whether during the brief recess after Bianchi's direct testimony he attempted to reach Attorney Smith, who had originally obtained Bianchi's statement exculpating Rodriguez, but he insisted that at that recess he consulted with Rodriguez about the scope of his cross-examination of Bianchi. (Sept. 2, 2010 Evid. Hr'g at 77-78, 80, 90-91, 93-94; Sept. 8, 2010 Evid. Hr'g Tr. at 9-10.)

[15] Rodriguez's testimony regarding whether he met with Attorney Mann immediately after Bianchi's direct testimony was somewhat unclear and inconsistent: after first stating he did not meet with Attorney Mann at this juncture, Rodriguez stated that he did have an opportunity to consult with Mann concerning the impending cross-examination of Bianchi; he then reverted to his previous testimony that he did not. (Sept. 8, 2010 Evid. Hr'g Tr. at 101-102.)

In the course of Rodriguez's trial, Attorney Mann was confronted with an unexpected, last-minute reversal in which a crucial defense witness recanted and testified in favor of the Government against Rodriguez. Mann's concern that cross-examining Bianchi regarding her prior written statement could backfire and end up harming Rodriguez's interests was not only understandable but prudent.[16] Thus, his strategy in seeking to minimize Bianchi's

---

[16] Attorney Mann's testimony sets forth his thinking on this issue:

Q.    So at that point, I put it to you, Mr. Mann, at that point, why did you decide not to cross-examine her? At that point the jury is hearing from her mouth that it wasn't her gun and that contradicts one of the prongs that you had to your defense.     At that point, what was left to lose by cross-examining her with her own words on her prior inconsistent statement?

A.    I think there was a lot to lose. I think that what would have happened is if I cross-examined her about that, [the prosecutor] probably would have been allowed to get into why she had made that earlier statement. She would have said she was either and/or trying to help Mr. Rodriguez and/or was pressured by his family.
        I thought we'd probably get a curative instruction from the Court saying that it might be limited to how much that could be inferred in terms of being Mr. Rodriguez's fault. But at the end of the day what I thought would happen was that the jury would hear that this young woman was saying, I made this statement to help Mr. Rodriguez, it was never my gun, I was pressured into making it, and it's false. And I thought going into that would be a lot more harmful than not going into it.

(Sept. 2, 2010 Evid. Hr'g Tr. at 73-74.)
        *    *    *

Q.    Okay. So if I'm hearing you correctly, you chose to frame -- to attempt to bracket what kind of testimony would actually get before the jury and give up in trade your right to get before the jury that [Bianchi] had claimed previously that it was her gun?

A.    Absolutely.    That was the trade-off because I thought it wouldn't just be her claim that it was her gun but her claim that she had done it because she was trying to help Mr.

-24-

time on the stand in order to downplay the impact of her testimony on the jury (Sept. 2, 2010 Evid. Hr'g Tr. at 76, 85-86) was eminently reasonable.[17]

This Court notes that Attorney Smith, while testifying as an expert, refrained from characterizing Mann's decision not to question Bianchi on her statement as objectively deficient. Rather, he stated that it was a "judgment call" and that, at most, Attorney Mann may have in hindsight requested more time to discuss with Rodriguez the nature and scope of his cross-examination of Bianchi. (Sept. 8, 2010 Evid. Hr'g Tr. at 38-39.) Smith also stated that while his own decision on this point "may well have been different than Mr. Mann's," Mann's decision was "a tactical

_____

Rodriguez, that she had done it because she was pressured by the family members, that she would then be on the stand for a much longer period of time saying repeatedly -- because my assessment was she was not going to deviate from her position that it was not her gun, saying up and down to the jury that it's not her gun and she now becomes a major witness as opposed to a witness whose testimony encompasses four or five pages.
    That was a judgment call. I think if I'd gone the other direction and we'd lost, as I've said before, somebody would be saying to me, Why did you open the can of worms? But it was my judgment call. Mr. Rodriguez, though I understand now he disputes it, at least concurred in the recommendation. But in any event, it was my judgment call, and I probably would make it again today.

(Id. at 85-86.)

[17] Attorney Mann testified that the reason he asked Bianchi about her pregnancy was to show the jury that at the time of trial she was distracted by other matters and wanted nothing to do with the events on the night of Rodriguez's arrest. (Sept. 2, 2010 Evid. Hr'g Tr. at 76-77.) Although ultimately not successful, this tactic was likewise reasonable.

decision that he felt was in his client's best interest. No question about that." (Id. at 40, 47.) Such testimony falls far short of showing deficient performance on the part of Attorney Mann in connection with the cross-examination of Bianchi.

Regarding prejudice, Rodriguez has made no showing whatsoever that questioning Bianchi on her previous statement, or otherwise, would have increased his chances of acquittal. He points to no evidence that she could have given, apart from the prior statement she had rejected, to show Rodriguez's innocence. Thus, even if Attorney Mann's failure to question her about that statement could somehow be deemed objectively deficient, Rodriguez has not shown how he was prejudiced. See Strickland, 466 U.S. at 692.

This Court further notes that the First Circuit and other courts have rejected ineffective assistance claims based upon inadequate cross-examination by trial counsel. See, e.g., Tevlin v. Spencer, 621 F.3d 59, 68-69 (1st Cir 2010) ("'Counsel here could have reasonably concluded that cross examination would at best be futile and at worst self-destructive.'") (quoting United States v. Moreno Morales, 815 F.2d 725, 751 (1st Cir. 1987)); Matthews, 54 F.3d at 918 (counsel's focus in cross-examining on rape victim's potential misidentification of defendant rather than on inconsistencies in her prior statements and her delay in reporting the rape held not to be ineffective assistance); Dell v. Straub, 194 F. Supp. 2d 629, 651-51 (E.D. Mich. 2002) ("Impeachment strategy is a matter of trial tactics, and tactical decisions are not ineffective assistance of counsel simply because in retrospect

better tactics may have been available.") (citation omitted); Henderson, 118 F.3d at 1287-88 (no ineffective assistance where counsel failed to introduce transcripts of witness's prior habeas testimony during cross-examination).

In short, this case presents a classic example of the well-established principle in habeas cases that defense counsel must be accorded discretion to conduct his trial strategy in light of frequently unexpected developments at trial and should not be judged in hindsight. Strickland, 466 U.S. at 689. It follows that Rodriguez has not shown that Attorney Mann's performance -- viewed in light of his extensive experience in criminal cases and the posture of this case in particular -- was objectively deficient at trial, nor has he shown prejudice. Thus, Rodriguez's ineffective assistance claim based on the failure of counsel to call or adequately question Bianchi must fail.

2. Ineffective Assistance – Failure to Call Rodriguez

Rodriguez's corollary claim, concerning Attorney Mann's failure to call him as a witness at trial in light of Bianchi's "flip-flop," likewise falls. As a procedural matter, this claim was not asserted as a ground either in Rodriguez's initial motion to vacate or in his subsequent supporting papers and was only raised for the first time in the course of this evidentiary hearing. However, because evidence on this claim was presented at the evidentiary hearing and the claim's merit (or lack thereof) is obvious, this Court considers it at this time.

The First Circuit has held that the failure of counsel to inform the defendant of his right to testify in his own defense could constitute ineffective assistance, noting that "[a] defendant has a fundamental constitutional right to testify in his own defense" and that "[t]he right to testify may not be waived by counsel acting alone." Owens v. United States, 483 F.3d 48, 58 (1st Cir. 2007) (internal quotations omitted).

Here, both Rodriguez and Attorney Mann testified that they discussed whether he should take the stand at trial and determined that he should not; thus, there is no question that Rodriguez knew of his right to testify.[18]  Attorney Mann testified that while he could not recall whether he re-visited the subject with Rodriguez in view of Bianchi's "flip-flop," he generally permitted his clients to testify at trial if they request to do so, even if the request is made in mid-trial.  Here, he was "positive" Rodriguez did not ask.  ( See Sept. 2, 2010 Evid. Hr'g Tr. at 98-99.) Rodriguez stated that he fully expected to testify and that Attorney Mann asked him during the recess immediately preceding Bianchi's cross-examination whether he still wanted to do so, that he said yes, but that Attorney Mann never called him.  (Sept. 8, 2010 Evid. Hr'g Tr. at 106-07.)

---

[18] By contrast, in Owens the Court of Appeals reversed the district court's denial of § 2255 relief without any hearing and remanded the case for an evidentiary hearing on whether Owens' counsel had informed him of his right to testify.  Owens v. United States, 483 F.3d 48, 61 (1st Cir. 2007).

This Court credits Attorney Mann's testimony that had Rodriguez insisted on testifying on his own defense, Mann would have permitted him to do so and finds that Rodriguez discussed the matter with his counsel but did not demand (or renew any prior demand) to testify after Bianchi's recantation of her statement. The Court concludes that Attorney Mann's failure to call Rodriguez did not constitute deficient performance. Given Rodriguez's extensive criminal record, including a conviction for suborning perjury in a previous court proceeding, this Court cannot say that his counsel's unwillingness to put him on the stand was unreasonable. This Court rejects Rodriguez's testimony that, notwithstanding his record, he expected to be called to testify in his own defense.[19] Moreover, Rodriguez has not shown how his taking the stand would have likely resulted in a greater chance of acquittal, or how he was otherwise prejudiced. Thus, this claim fails.

3. Perjurious Testimony

Rodriguez claims in his motion to vacate that testimony given at trial by Providence Police Officers Petrocchi, Hames, Renzi, Moscarelli, and Kennedy was false and therefore perjurious. (Mot. to Vacate - Ground Two.) Specifically, he asserts that Petrocchi's testimony that he found the gun was contradicted by testimony that

_____

[19] This Court also specifically rejects Rodriguez's testimony that Attorney Mann lied under oath at this evidentiary hearing and that he intentionally betrayed Rodriguez at trial. (Sept. 8, 2010 Evid. Hr'g Tr. at 119-121, 122.)

other officers had found the gun and that Petrocchi was confused as to the exact location where the firearm was found and the number of fences he crossed while chasing Rodriguez.

Rodriguez further claims that Hames and Kennedy testified falsely at trial concerning finding Rodriguez's sunglasses near the gun; that Detective Renzi testified falsely regarding fingerprinting the sunglasses; and that the lack of fingerprints on the sunglasses supports his claim that they were taken from him after he was apprehended and planted next to the gun. He also claims that police dispatch reports that he obtained pursuant to his FOIA request contradict the times given by the officers at trial concerning when they had arrived on the scene, and that therefore their version of the arrest was not correct.[20]

None of these claims warrant relief. A review of the record shows that at most, there were minor inconsistencies in the testimony of Petrocchi and Hames and other officers from each other and from the police dispatch reports. It is well established that "[i]nconsistent testimony by itself does not amount to perjury." United States v. Tavares, 93 F.3d 10, 14 (1st Cir. 1996). See United States v. Gary, 74 F.3d 304, 314 (1st Cir. 1996) ("it is axiomatic that inconsistent testimony is not per se perjurious"). Moreover, discrepancies in the testimony by police officers at a criminal trial are for the jury to resolve. See United States v.

---

[20] The dispatch records show that communications were made at approximately 1:05 a.m. rather than at 12:53 a.m., as some of the officers had testified at trial.

<u>Ayala-Garcia</u>, 574 F.3d 5, 12, 15 (1st Cir. 2009) (jury was free to choose which of two conflicting accounts of events to believe, so long as evidence is adequate to establish guilt beyond a reasonable doubt).

Here, the alleged examples of false testimony are based on <u>selected portions</u> of the trial transcripts, followed by a conclusory statement that the testimony is perjurious. ( <u>See</u> Rodriguez's Brief accompanying Mot. to Vacate ["Pet'r's Mem."], ECF No. 1-4 at 1-11.)  Nowhere does Rodriguez assert how the reproduced portions are false, nor does he point to any evidence that the cited testimony was falsely given with the intent to deceive the jury.  All of the police witnesses were subjected to rigorous cross-examination by Rodriguez's counsel.  Both the firearm in question and the sunglasses were produced at trial, and portions of the dispatch tape were played for the jury.[21]  Moreover, Rodriguez presented favorable testimony from two passengers of the vehicle in which he was riding, including testimony that conflicted with Susan Bianchi's testimony at trial that she did not have the gun. Notwithstanding this conflicting evidence, there was more than

---

[21] This Court has reviewed the audio tape recording of police dispatch reports that was produced at the evidentiary hearing. While much of the tape is unintelligible, the audible portions (e.g., "looks like he has a gun" and "we've got a Glock") are consistent with the transcripts of the selected portions of the tape produced at trial and clearly support the police version of events concerning the arrest.  The entire tape is ten minutes or less in length, which also supports the police version of the arrest.

ample evidence for the jury to have found that Rodriguez had possessed the gun in question.[22]

Finally and significantly, the Court of Appeals considered and rejected virtually identical claims on Rodriguez's direct appeal in the context of his arguments based on the sufficiency of the evidence. In considering many of the same points, the Court noted that:

> [e]vidence does not become legally insufficient merely because of some inconsistencies in witnesses' testimony nor questions over, for example, which officer found the gun first and police decisions not to test the gun and sunglasses for fingerprints. These were all proper matters for the jury to evaluate in determining witness credibility and the overall strength of the evidence. We are satisfied that from the evidence presented a rational jury could have found Rodriguez guilty of the offense charged beyond a reasonable doubt.

Rodriguez, 457 F.3d at 119.

In short, this claim amounts to nothing more than a second attempt by Rodriguez to attack the weight of the evidence, which cannot succeed.

---

[22] Rodriguez points out that Officer Fallon, who according to the dispatch reports was the first officer to arrive on the scene, was never called to testify at trial or even mentioned during the trial. However, the Government was not required to call any specific witness to prove its case where there was ample evidence otherwise to convict Rodriguez. See Malik v. Kelly, No. 97-CV-4543(RR), 1999 WL 390604, at *7 (E.D.N.Y. Apr. 6, 1999) ("The Constitution does not require the government to call as prosecution witnesses all persons who have information relevant to charged crimes.") (citing United States v. Miguel, 340 F.2d 812, 815 (2d Cir.1965) (further citations omitted)).

4. Prosecutorial Misconduct

Rodriguez further claims that the Government prosecutor was guilty of prosecutorial misconduct in failing to disclose exculpatory evidence – namely the prior statement of Bianchi in which she claimed responsibility for the gun in question – to both the grand jury and at trial, in violation of Brady, 373 U.S. at 83. (Mot. to Vacate - Ground Three.)[23]

The short answer to this claim is that the evidence in question was obtained by Rodriguez's counsel, not by the Government. As noted above, within one week of Rodriguez's arrest, Bianchi approached Attorney Smith, who represented Rodriguez in the state violation proceedings, and claimed that the gun was hers and that she hid it (presumably in the backyard where it was found) on the night of the arrest. Moreover, Attorney Mann obtained Bianchi's statement well before trial, and he or his agent met with her on more than one occasion before trial. His defense theory was centered on Bianchi's acceptance of responsibility for the gun. When Bianchi recanted and became a Government witness, the statement remained fully available to defense counsel to use in

---

[23] In Brady the Supreme Court held that the Government's suppression of evidence favorable to an accused "violates due process where the evidence is material to guilt or punishment." Conley v. United States, 415 F.3d 183, 188 (1st Cir. 2005) (citing Brady v. Maryland, 373 U.S. 83, 87 (1963)). Nondisclosure of impeachment evidence may constitute a Brady violation if it is material. Id. (citing Strickler v. Greene, 527 U.S. 263, 281-82 (1999)). Because this Court concludes that the evidence in question does not even constitute Brady material, it need not inquire as to whether three-part criteria for establishing a Brady violation is satisfied here.

cross-examining Bianchi, had counsel wished to do so. ( <u>See</u> discussion in section I <u>supra</u>.)

Because the statement in question was originally obtained by, and at all times was under the control of, his defense counsel, it does not constitute information subject to <u>Brady</u>. Moreover, to suggest that the Government must disclose to a jury exculpatory information that was initially obtained by, and was at all times in the possession of, the defendant borders on the frivolous. Thus, this claim is devoid of merit.

            5.   Questions during Voir Dire

Rodriguez further claims that certain questions asked by a prospective juror during voir dire proceedings concerning Rodriguez's prior felony "tainted" the venire, including those jurors who were selected to sit on his trial, and that as a result, his due process rights were violated and his conviction should be reversed.  (Mot. to Vacate - Ground Four.)

The record shows that during voir dire proceedings, one of the prospective jurors inquired as to whether the jury would be informed as to the nature of the predicate offense for the charged felon-in-possession offense and voiced his belief that it was significant whether the previous felony involved a firearm.  (<u>See</u> Trans. of Jury Empanelment Sept. 1, 2004 ["Jury Emp. Tr."] at 62-65.)[24]  Later in the proceedings, defense counsel also questioned

_____

        [24]  The  pertinent  excerpts  from  the  jury  impanelment proceedings, as cited in this section of the instant Memorandum and Order, are set forth in the Appendix attached to this Memorandum and Order.

the prospective juror, who again voiced the same concerns. (<u>Id.</u> at 82-89.)

"When a potentially taint-producing event threatens to mar the jury's integrity, the district court has fairly broad discretion in deciding whether the situation is susceptible to remediation, and if so, what corrective action might be appropriate." <u>United States v. Sepulveda</u>, 15 F.3d 1161, 1195 (1st Cir. 1993). <u>See</u> <u>United States v. Hunnewell</u>, 891 F.2d 955, 960-61 (1st Cir. 1989) (same).

Here, this Court is satisfied that the prospective juror's questions and the resulting exchange with the Court and counsel did not warrant dismissal of the jury pool. In response to the prospective juror's questions concerning the prior offense, this Court clearly stated that the details of Rodriguez's previous prior felony offense were irrelevant to the instant offense. (Jury Emp. Tr. at 62-65.) When the prospective juror reiterated his concerns while being questioned by defense counsel, this Court further explained that notwithstanding his belief that the nature of the prior felony should be disclosed, he (and all jurors) must accept the law as it is, and not as they believed it should be, and still make a fair judgment as to the present felon-in-possession charge – even if the nature of the prior felony is not disclosed. (<u>Id.</u> at 83-86.) This Court then questioned the prospective juror as to whether he could render a fair verdict if those details were not disclosed at trial. (<u>Id.</u> at 85-86.)

In addition, defense counsel also questioned the entire venire regarding their ability to decide the case, knowing that Rodriguez had stipulated to having committed a previous felony but without knowing whether the previous felony involved a firearm, and did not thereafter request that the venire be dismissed. (<u>Id.</u> at 89-91.)[25]

In short, considering the voir dire proceedings overall, including this Court's statements to the prospective jurors, it is clear that the jury venire was adequately questioned as to its impartiality and thus there was no need to dismiss the jury panel. See <u>United States v. Rojo-Alvarez</u>, 944 F.2d 959, 970 (1st Cir. 1991) (no error in judge's refusal to dismiss jury panel after prospective juror's statement during voir dire that sexual assault victims were generally credible, while the alleged assailants were not, where judge questioned jurors as to their impartiality and no objection was made by defense counsel). Therefore, this claim fails as well.

6. Ineffective Assistance of Appellate Counsel

Rodriguez asserts in his motion that his appellate counsel failed to raise his prosecutorial misconduct and tainted jury pool claims on appeal, despite his request. (<u>See</u> Mot. to Vacate, Ground Three (b), Ground Four (b), ¶ 13.) To the extent that Rodriguez

---

[25] The prospective juror who had inquired as to the nature of the prior felony was ultimately excused and did not serve at trial. (Trans. of Jury Empanelment Sept. 1, 2004 ["Jury Emp. Tr."] at 94.)

purports to assert an ineffective assistance claim as to his appellate counsel, such claim fails.

To establish ineffective assistance of appellate counsel, a defendant "must first show that his counsel was objectively unreasonable." Smith v. Robbins, 528 U.S. 259, 285 (2000). As applied to appellate counsel, that standard is difficult to meet because, to be effective, "appellate counsel . . . need not (and should not) raise every nonfrivolous claim, but rather may select among them in order to maximize the likelihood of success on appeal." Id. at 288. Even if a defendant succeeds in making that showing, he must still "show a reasonable probability that, but for his counsel's unreasonable failure to [raise a particular issue], he would have prevailed on his appeal." Id. at 285.

Here, the claims that Rodriguez allegedly asked his appellate counsel to raise have been discussed above and found to be without merit. Thus, counsel was not deficient in failing to raise those claims on direct appeal, nor was Rodriguez prejudiced by their absence. Accordingly, this claim fails.

The Court has considered all other arguments raised by Rodriguez, and finds them to be without merit.

III. Conclusion

For all of the foregoing reasons, Rodriguez's motion to vacate sentence is denied and dismissed.[26]

### RULING ON CERTIFICATE OF APPEALABILITY

Pursuant to Rule 11(a) of the Rules Governing § 2255 Proceedings in the United States District Courts ("§ 2255 Rules"), this Court hereby finds that this case is <u>not</u> appropriate for the issuance of a certificate of appealability (COA) because Rodriguez has failed to make a substantial showing of the denial of a constitutional right as to any claim, as required by 28 U.S.C. § 2253(c)(2).

Rodriguez is advised that any motion to reconsider this ruling will not extend the time to file a notice of appeal in this matter. <u>See</u> § 2255 Rule 11(a).


SO ORDERED:


*/s/ William E. Smith*
William E. Smith
United States District Judge
Date: January 10, 2011

---

[26] In view of the disposition of the motion to vacate, this Court also denies Rodriguez's <u>Motion for Release on Personal Recognizance</u> (ECF No. 52). A separate Order shall issue.

MR. ROSE:          *      *      *
You've already learned the defendant has a  prior conviction for a
crime punishable by more than one year in jail.  It is an element
of the offense charged in this case. You are not allowed to hold
that fact against the defendant in any way. Particularly, you must
not conclude that because he has violated the law in the past, that
he must have done something wrong in this case.

Does everyone understand that?  Sir?

THE JUROR:      We're not to allowed to know what was involved in
the first crime?

THE COURT:      The answer is that it's an element of the offense
that he has a previous conviction. And beyond that, that's all you
need to know for purposes of this charge, because he's not on trial
for the previous conviction.  He was convicted for that, whatever
it is.  And that's all you need to know.

Truthfully, I don't know what it is.  At the moment, I couldn't
tell you what it is.  I know that this defendant has been, or they
will need to prove that he's been convicted of a crime punishable
by in excess of one year. And that's it.  And I emphasize to you,
to all of you, this defendant is only on trial for the charge in
the indictment that I read to you. You need to be able to accept
that fact.

THE JUROR:      The way you're wording it, it sounds like it's more
of a serious crime because of the fact there was already a crime
before this.  I don't understand why wouldn't you be able to know
if a gun was involved in the first one.

THE COURT:      Well, for the simple reason that I just stated, and
it's an important reason.  And that is that when someone is accused
of a crime, you really -- you may only consider the evidence of
whether they committed that crime.  And it doesn't matter whether
they committed other crimes or done other bad things.  And the law
doesn't want that to sort of seep into your head and influence you.
Okay?

Now, in this case, the specific crime involves as an element of the
offense a prior conviction. So that is an issue, but it's only
that.

THE JUROR:      But the letter of law is there a difference between
somebody being caught with a weapon that say is not registered and
somebody who's been caught with a weapon who's already served
incarceration for being in jail for a year.

THE COURT:      They're different offenses.   They are different
offenses. Okay?

THE JUROR:      How do you know the difference?  I don't understand
why you can't tell me --

THE COURT:      Maybe I didn't understand your question.  Ask the
question again.

THE JUROR:      Is there a difference in the penalty as far as being
caught with a weapon in the act of a crime -- say that was the

first offense. Is it more severe if you've already had a prior conviction and you've done more than a year in jail? I don't understand why he's saying a year in jail makes a difference.

THE COURT: That's what defines the term -- that is the way the law is drafted. Okay? There are crimes which are more serious or less serious, felonies versus misdemeanors.

THE JUROR: It sounds like the way you're saying it is the fact that prison sentence of over a year makes a difference because of the alleged being caught with a weapon.

THE COURT: It does because that is an element of the offense, that someone who has a misdemeanor offense and is in possession of a firearm can't be charged with this offense that this defendant is charged with. All right?

(Jury Emp. Tr. at 61-65.)

-----------------------------------------

MR. MANN: *    *     *

I want to follow-up, Mr. [-----] , is it, on the questions that you were raising at the conclusion of Mr. Rose's questioning if I could, sir. And while I'm asking any of these questions, they really apply to everybody to some extent, of course.

You know now that Mr. Rodriguez has a criminal conviction for something, for a case that carried more than a year in jail, right?

THE JUROR: Correct.

MR. MANN: And you have questions about that, right?

THE JUROR: I just don't understand how the second crime, the severity of the second crime is greater because of the fact of the first crime, but we don't get any information on the first crime. I don't know if there's an any weapon involved in the first crime. The reason I'm asking is if I knew somebody did a crime, a second crime they were convicted for and there was a weapon involved in the first crime, then as far as I'm concerned, they shouldn't be allowed to carry a weapon. That's why I was asking.

MR. MANN: And then the follow-up question is if all you learn is -- if all you came to learn was that there was a conviction for a crime that carried at least or more than a year in jail, prison, would that affect your deliberations as to whether or not in this case Mr. Rodriguez possessed a gun?

THE JUROR: It would if I knew there was a weapon involved in the first crime, yes.

MR. MANN: And if you didn't know, would it affect -- if you just weren't told, would it affect your deliberations?

THE JUROR: Probably, because I think we should know.

THE COURT: Let me follow-up with this. I tried to listen carefully to what it is that's going on in your mind here about this. And I thought I heard you say something about what you thought the law should be. That is, I thought I heard you say that, well, if this defendant committed a crime that involved the

-40-

use of a firearm previously, then I don't think he should be allowed to carry a firearm.  Did you say something like that?

THE JUROR:     Yes.

THE COURT:     All right.  So that leads me to a question of you that as a juror you -- this applies to everybody you must separate what you think the law should be from what it is.  Okay?  You have to separate what you think the law ought to be from what it is.

Now, you're going to hear the facts of this case.  And then at the end of the case, I'm going to instruct the jury on what the law is.  And one of the things I'm going to tell the jurors is that the law says, whether you think this is a good idea or a bad idea, that someone who has been convicted of a crime previously, punishable in excess of one year, one year or more, cannot carry a firearm.

Now, you may think that shouldn't be the law.  You may think that it should only be people who are convicted of those kinds of crimes that involve firearms ought to be prevented from using firearms.  That's not what the law says.  What the law says is what I just said to you.  All right?

So you need to just accept that, that that's what the law says.  And the only question in this case is whether this defendant violated that law.  All right.

Now, can you do that?  Can you separate what you think the law ought to be or from what it is and just accept it as I give it to you?

THE JUROR:     I think we should know what happened with the first crime.  I understand what you're asking.

THE COURT:     I know you wish you knew that.  Okay?

THE JUROR:     I understand what you're asking, but I can't say yes.

THE COURT:     And why not?

THE JUROR:     Because that's not the way I believe it should work.  To me, we should be allowed to know what the first one was, what the first crime was.

THE COURT:     Answer my first question, and then I'm going to follow-up with you.  Can you accept the law as I give it to you and simply apply the facts and decide what the facts are of the case and apply the law as I give it to you and only that?

THE JUROR:     Yes, but I don't understand why.

THE COURT:     All right.  We'll get to the understanding why.  But you think you can do that?

THE JUROR:     Yes.

THE COURT:     Okay.  Now, in this case -- before a trial, you don't know what's going to happen and how the lawyers are going to present the case.  It could very well be that the Government has to prove the prior conviction in this case, or there could be what's called a stipulation that that element of the offense is met, or the Government could fail to prove it, that there was a prior conviction.

We don't know, because right now we have nothing but a clean slate. Okay?

Now, as you sit here, you might say, well, if I'm going to sit as a juror in this case and if that's an element of the offense, I want to know what the prior conviction is. That's essentially what you've said. If there is one, I want to know what it is.

Assuming there is a prior conviction, the parties may just stipulate simply to its existence, and you don't get to know what it is. Can you accept that and not let your desire to know interfere with your judgment of what the facts are in this case?

MR. MANN:      Can I ask one thing, Judge?

THE COURT:      Sure.

MR. MANN:      There's not going to be any dispute about the prior conviction.

THE COURT:      Okay. I'm not going to say that. If you want to say that --

MR. MANN:      I'm saying that, Judge. There's no dispute about the prior conviction.

THE COURT:      All right. So now you've heard defense counsel tell you there's no dispute that there's a prior conviction. Okay? It's undisputed.

THE JUROR:      We're just not going to know what the prior conviction was.

THE COURT:      You may or you may not. But the point is can you put aside your desire to know what it is, because that's all this is, you desire to know what it is. You think you ought to know. All right? Well, the law doesn't say you ought to know or that you have to know.

Can you put aside your curiosity essentially and just judge the facts of this case and apply the law as I give it to you. Can you do that?

THE JUROR:      I can answer that question if you can answer the question of you have no idea what we're going to find out, right? You won't know that until the trial.

THE COURT:      The attorney for the defendant has just stated that there is no dispute that there was a prior conviction in this case.

THE JUROR:      I'm not talking about prior conviction. I'm talking about whether or not there was a weapon involved. We won't find that out until --

THE COURT:      I don't know. I don't know if that's going to come in or not, but I'm trying to ask of you -- whether it comes in or not, is not the point. The point is whether this defendant committed the crime that he's charged with, and can you put aside your personal desire to know his prior conviction and simply reach, conclude what the facts and apply the law as I give it to you.

THE JUROR:      Yes.

THE COURT:      Do you think you can do that? Mr. Mann, do you want to inquire further on this?

-42-

MR. MANN:        Just a little bit.  Knowing that Mr. Rodriguez has a prior conviction, can you be fair to him in determining whether or not the Government has proved that he did or did not possess the gun in this case?

THE JUROR:        I think so.

MR. MANN: When you say you think so, a lawyer obviously starts to ask the question what do you mean when you say you think so.

THE JUROR:        Like the judge said, I'm not going to know if that information is going to come out, so that's kind of hard to answer the question.

MR. MANN:        Well, then my question wasn't clear enough then.  My question to you is this, if all you end up knowing is that Mr. Rodriguez has a prior conviction and you don't learn anything else, but you know he's got this prior conviction, can you be fair to him in determining whether or not the Government has proved beyond a reasonable doubt that he possessed a gun?

THE JUROR:        If the Government can prove it, yes.    If the Government can prove it.

MR. MANN:        Now I want to generalize that question to everybody, because now it's really clearly out in the open that there's no question, the judge read you the indictment earlier, Mr. Rose questioned you, you all know unequivocally that Mr. Rodriguez has a prior conviction.

Is there anybody who because of that prior conviction feels they can't be fair in deciding whether or not the Government can prove its case, has proved its case beyond a reasonable doubt?  Is there anybody who sort of says he's been in the system once, that's it.  There's no burden on the Government, end of story basically.

No.  Thank you.

(Jury Emp. Tr. at 82-90.)